**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| JIM QUASEBARTH, and | * | |
| ROBYN QUASEBARTH | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action File No. __4:14cv223_____ |
| | * | |
| GREEN TREE SERVICING, LLC, | * | |
| | * | |
| Defendant. | * | |
| _____ | * | |

## COMPLAINT

COMES NOW the Plaintiffs, Jim Quasebarth and Robyn Quasebarth (collectively the "Plaintiffs"), and show as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs, Jim Quasebarth ("Jim") and Robyn Quasebarth ("Robyn"), are citizens of the State of Georgia.

2. Green Tree Servicing, LLC ("Green Tree") is a foreign corporation incorporated under the laws of Delaware. Green Tree's principal place of business is located at 345 St. Peter Street, # 300, St. Paul, Minnesota 55102. Green Tree's registered agent for service of process is CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Georgia 30361. Green Tree transacts substantial business in this district and division.

3. There is complete diversity of citizenship between Plaintiffs and Green Tree and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Therefore this Court has subject matter jurisdiction over the claims asserted herein according to 28 U.S.C. § 1332.

4.   This Court has personal jurisdiction over Green Tree.

5.   Because of the substantial business contacts which Green Tree has in this district and
division, Green Tree is deemed to reside in this district and division.

6.   Venue is proper in this district according to 28 U.S.C. § 1391(b)(1) because Green Tree
resides in this judicial district.

7.   Venue is also proper in this district according to 28 U.S.C. § 1391(b)(2) because a
substantial part of the events or omissions giving rise to the claims asserted herein
occurred in this district.

## **OPERATIVE FACTS**

### Green Tree Servicing, LLC

8.   Green Tree is based in St. Paul, Minnesota and operates approximately 29 offices for its
debt collection operations.  Green Tree operates as a wholly owned subsidiary of Walter
Investment Management Corp. (NYSE: WAC).

9.   Green Tree is one of the largest servicers of home loans in the United States.  It services a
range of assets including residential mortgages, second liens, HELOC, consumer
installment, and a portfolio of manufactured housing loans.  Green Tree specializes in
servicing subprime residential mortgages.

10.  One of the primary goals of its debt collection practices is to defraud or otherwise
unlawfully obtain or maintain an interest in money or property from its customers by
means of false or fraudulent pretenses, representations, or promises.

11.  As is shown below, Jim and Robyn are the victims of Green Tree's fraudulent debt
collection practices.

<u>Jim and Robyn Purchase a Home in Acworth, Georgia</u>

12. On February 15, 2007, Jim and Robyn executed a deed to secure debt (the "Security Deed") to Mortgage Electronic Registration System, Inc. as nominee for Quicken Loans, Inc. ("Quicken") conveying a security interest in their home located at 806 Silver Mound Circle NW, Acworth, Georgia 31102 (the "Property").[1]

13. On February 15, 2007, Jim and Robyn executed a promissory note (the "Note") to Quicken in the amount of $252,000.00, plus interest, with the last payment due not later than March 1, 2037.

14. Jim and Robyn's loan was a federally insured FHA loan.

15. At some point, Green Tree became the primary servicer of the loan.

16. Due to circumstances beyond their control, Jim and Robyn were not able to make their June 2012 mortgage payment to Green Tree.

17. Shortly after June 1, 2012, Green Tree began calling Jim to collect the June 2012 mortgage payment, often calling multiple times per day and several consecutive days in a row.

18. During this time, Green Tree called Jim from different phone numbers.  Jim called these numbers on several occasions, but was unable to reach Green Tree at the same.  On several occasions when Jim called a number from which Green Tree previously called him, Jim discovered that the phone number did not belong to Green Tree.

19. Jim and Robyn made their June 2012 payment on June 29, 2012, check no. 3698.[2]

---

[1] A true and correct copy of the Security Deed is attached hereto as Exhibit 1.
[2] A true and correct copy of Check No. 3698 is attached hereto as Exhibit 2.

20. On June 30, 2012, Green Tree called Jim three times to inquire whether he planned to make his July 2012 payment. Jim advised Green Tree that he could not make the July payment at that time.

21. Due to circumstances beyond their control, Jim and Robyn were not able to make their July 2012 mortgage payment to Green Tree.

22. Green Tree continued to call Jim throughout July 2012 to collect this payment. Jim told Green Tree that he would make the July 2012 payment when he was able to do so.

23. Due to circumstances beyond their control, Jim and Robyn were not able to make their August 2012 mortgage payment to Green Tree.

24. Green Tree continued to call Jim throughout August 2012 to collect the July and August 2012 payments. Jim told Green Tree that he would make these payments when he was able to do so.

25. In August, 2012, Jim and Robyn spoke with four of their relatives, Nikki and Christopher Barre (the "Barres") and Dittra and Jack Graham (the "Grahams"), about their recent financial difficulties. During this conversation, the Barres and Grahams offered to loan Jim and Robyn the money they needed so that they could get caught up on their mortgage. Jim and Robyn told the Barres and Grahams that they would accept their personal loan in the event they were unable to secure a loan modification from Green Tree.

26. On August 13, 2012, Jim called Green Tree to discuss the status of his mortgage and spoke with Andre Stetson ("Mr. Stetson"), a Green Tree representative. During this telephone call Jim offered to make a partial payment, but Mr. Stetson refused to accept same. Jim also asked Mr. Stetson if he qualified for a loan modification. Mr. Stetson

told Jim he did not qualify for a traditional loan modification.  Mr. Stetson did, however,

tell Jim that Green Tree would consider approving him for an "in-house modification"

(hereinafter the "Modification") in order to cure the default.  Mr. Stetson told Jim that

Green Tree would let him know whether the application was approved after he submitted

the same to Green Tree.

27. On or about August 17, 2012, Green Tree faxed Jim the application for the Modification.

28. Shortly after he received the application for the Modification from Green Tree, another

Green Tree representative called Jim in an attempt to collect the past due July, and

August mortgage payments.  During this telephone call, Jim again told the Green Tree

representative that he would make the past due mortgage payments when he was able to

do so.  The Green Tree representative asked Jim if Green Tree could continue to call him

to discuss his past due mortgage payments.  Feeling harassed by the relentless telephone

calls, Jim asked Green Tree to stop calling him about the past due mortgage payments.

29. On September 11, 2012, Jim mailed the application for the Modification to Green Tree

via U.S. Mail, with delivery confirmation, label # 031208600001680/5311.[3]

30. Due to circumstances beyond their control, Jim and Robyn were not able to make their

September 2012 and October 2012 mortgage payments.

31. On October 1, 2012, MERS filed and recorded an Assignment of Security Deed

conveying, granting, transferring, and setting over the Security Deed with all interest

secured thereby, all liens and any rights due or to become due thereon to Green Tree.[4]

---

[3] A true and correct copy of the receipt for sending the application for the Modification on
September 11, 2012 is attached hereto as Exhibit 3.
[4] A true and correct copy of the Assignment of Security Deed is attached hereto as Exhibit 4.

32. On or about October, 2012, Green Tree referred Plaintiffs' loan to the law firm of Ellis, Payne, Ratterree, & Adams, LLP ("EPRA") to commence foreclosure proceedings on the Property.

33. On October 16, 2012, EPRA sent a letter to Jim and Robyn, via U.S. Mail, advising them that Green Tree had retained EPRA to commence foreclosure proceedings on the Property and that a foreclosure sale would be conducted on December 4, 2012.[5] The October 16, 2012 letter was sent to Jim and Robyn for the purpose of executing Green Tree's fraudulent scheme to acquire and maintain an interest in real property or personal property, including money.

34. Jim was confused when he received the October 16, 2012 letter from EPRA because he believed Green Tree was considering his application for the Modification so that he could cure the default and that foreclosure was not necessary.  Jim immediately called Green Tree after he received the October 16, 2012 letter to speak with Andre Stetson, but was unable to reach him.  Jim left Mr. Stetson a voicemail asking Mr. Stetson to return his telephone call.  Mr. Stetson did not, however, return Jim's telephone call.

35. On October 24, 2012, Jim called Green Tree and spoke to Andre Stetson.  During this telephone call, Jim asked Mr. Stetson why Green Tree initiated foreclosure proceedings after he submitted the application for the Modification to cure the default.  Mr. Stetson told Jim that Green Tree lost his application for the Modification.  Mr. Stetson told Jim if he submitted a new application for an in-house modification, Green Tree would let him know whether he was approved for the same before December 4, 2012, the date the Property was to be sold at a foreclosure sale, so that Jim could otherwise cure the default.

---

[5] Plaintiffs do not currently possess a copy of the October 16, 2012 letter.  The October 16, 2012 letter is referenced in a letter dated January 29, 2013.  *See* Exhibit 11 hereto.

Jim told Mr. Stetson that he accepted Mr. Stetson's proposal and agreed to submit a second application for the Modification with the promise that Green Tree would notify him whether the same was approved on or before December 4, 2012.  However, Mr. Stetson had no intention of notifying Jim whether he was approved for the Modification before December 4, 2012.

36. On October 29, 2012, Jim called Green Tree to again confirm that Green Tree would let him know whether the application for the Modification was approved before the December 4, 2012 foreclosure sale.  The Green Tree representative Jim spoke with told him that Green Tree would definitely notify him before December 4, 2012 whether his application for the Modification was approved.

37. On November 6, 2012, Jim spoke with Andre Stetson on the telephone about the application for the Modification.  During this telephone call, Jim asked Mr. Stetson why Green Tree had not yet contacted him about or otherwise sent him the application for the Modification.  Mr. Stetson told Jim Green Tree was not permitted to contact him about the Modification because Jim previously told Green Tree to stop contacting him in August, 2012.  Mr. Stetson told Jim that if he wanted Green Tree to contact him about the Modification or any other matter related to his account, Jim had to execute a written authorization giving Green Tree permission to communicate with him.

38. During the November 6, 2012 telephone call, Mr. Stetson also told Jim that if he executed the written authorization and submitted a new application for the Modification, Green Tree would notify him whether the Modification was approved not later than thirty (30) days from the date Jim submitted the new application for the Modification.  Mr. Stetson also told Jim that Green Tree would postpone the foreclosure sale if it had not notified

him whether it was going to approve the application for the Modification before December 4, 2012.  Jim told Mr. Stetson that he accepted Mr. Stetson's proposal and agreed to submit a second application for the Modification with the understanding that Green Tree would let him know whether the same was approved within thirty (30) days after he submitted the same to Green Tree and that if Green Tree did not notify him before December 4, 2012, Green Tree would postpone the December 4, 2012 foreclosure sale.  At that time, Mr. Stetson had no intention of notifying Jim whether he was approved for the Modification within 30 days from the date Jim submitted the application for the Modification or otherwise postponing the December 4, 2012 foreclosure sale.  Mr. Stetson made this misrepresentation to Jim with the intent to lead Jim to believe that the December 4, 2012 foreclosure sale would be postponed so that Jim would not cure the default on or before December 4, 2012.

39. Jim immediately executed and sent the written authorization to Green Tree allowing Green Tree to contact him about his mortgage.  Jim thereafter received an application for the Modification from Green Tree.

40. On November 8, 2012, Jim faxed and Green Tree received the second application for the Modification to Green Tree.

41. Pursuant to the agreement between Jim and Green Tree, by and through Mr. Stetson, Jim reasonably believed that Green Tree had until December 8, 2012 to notify Jim whether Green Tree approved his application for the Modification and, if Green Tree did not notify Jim of the same before December 4, 2012, Green Tree would postpone the December 4, 2012 foreclosure sale.

42. On November 9, 2012, Green Tree ran a foreclosure notice in the Marietta Daily Journal stating that it would conduct a foreclosure sale on December 4, 2012.[6]

43. On November 16, 2012, Green Tree ran a foreclosure notice in the Marietta Daily Journal stating that it would conduct a foreclosure sale on December 4, 2012.[7]

44. On November 16, 2012, Jim called EPRA to discuss the status of the December 4, 2012 foreclosure and spoke with a female representative.  Jim asked the EPRA representative about the status of his foreclosure and told her that he recently submitted the application for the Modification to Green Tree on November 8, 2012.  The EPRA representative told Jim not to worry about the foreclosure because he had enough time to cure the default in the event Green Tree did not approve the application for the Modification.

45. On November 23, 2012, Green Tree ran a foreclosure notice in the Marietta Daily Journal stating that it would conduct a foreclosure sale on December 4, 2012.[8]

46. On November 30, 2012, Green Tree ran a foreclosure notice in the Marietta Daily Journal stating that it would conduct a foreclosure sale on December 4, 2012.[9]

47. Green Tree failed to uphold its promise to notify Jim whether his application for the Modification was approved before December 4, 2012 or December 8, 2012.  Green Tree did not contact Jim between November 8, 2012 and December 8, 2012.

48. On December 6, 2012, while he was at home, Jim heard a knock on the front door to his home.  When Jim opened the door, a man named Wes Craven introduced himself as an employee of Mona Friedman, a real estate broker from Atlanta Communities who was hired by Fannie Mae to extend an offer of relocation assistance to Jim and Robyn.

---

[6] A true and correct copy of the foreclosure notice is attached hereto as Exhibit 5.
[7] *See id.*
[8] *See id.*
[9] *See id.*

During this conversation, Mr. Craven told Jim the Property had been sold at the December 4, 2012 foreclosure sale and extended an offer of relocation assistance to Jim and Robyn, generally known as Cash for Keys, if Jim and Robyn would voluntarily vacate the Property.   Jim refused Mr. Craven's offer of relocation assistance.

49. Jim did not understand why the Property had been sold because he reasonably believed that Green Tree had postponed the foreclosure sale since Green Tree had not notified him before December 4, 2012 whether the Modification had been approved.

50. Jim immediately called Mona Friedman after his December 6, 2012 conversation with Wes Craven.  Jim was unable to reach Ms. Friedman and left her a voicemail message asking that she return his call.

51. On December 7, 2012, Mona Friedman returned Jim's December 6, 2012 telephone call. During their telephone conversation, Jim told Ms. Friedman he did not understand why the Property had been sold at the December 4, 2012 foreclosure sale since he was negotiating with Green Tree for the Modification.  Ms. Friedman told Jim "I see this all the time, it's disgusting.  I will notify Fannie Mae that you are protesting the foreclosure."

52. On December 7, 2012, Jim sent Ms. Friedman an email as a follow up to their December 7, 2012 telephone call.[10]

53. On December 8, 2012, Ms. Friedman responded to Jim's December 7, 2012 email.[11] Within same Ms.  Friedman stated "I have placed a note in the Fannie Mae system to inform them that you are questioning the validity of the foreclosure due to ongoing negotiations of a loan modification at the time of the sale last Tuesday . . . Fannie Mae is

---

[10] A true and correct copy of Jim's December 7, 2012 email to Mona Friedman is attached hereto as Exhibit 6.
[11] *Id.*

extending an offer of relocation assistance to you.  If you vacate the [P]roperty by

12/22/2012 they will give you a check for $2200 and if you would prefer to wait until

1/6/2012, they will pay you $1050.  If this is of interest to you, please let me know."

54. On December 10, 2012, Jim called Green Tree to discuss the foreclosure sale that he was

led to believe took place on December 4, 2012.  The Green Tree representative Jim spoke

to told Jim the December 4, 2012 foreclosure was final and all further inquiries about the

same should be directed to EPRA.  At that time, Green Tree knew that the foreclosure

sale was not final and that the deeds had not been recorded.

55. Following his December 10, 2012 phone call with Green Tree, Jim immediately called

EPRA to discuss the foreclosure sale he was led to believe took place on December 4,

2012.  During this telephone call, the EPRA representative told Jim the December 4,

2012 foreclosure was final and all further inquiries about the same should be directed to

Green Tree.

56. On December 13, 2012, Jim called Green Tree to discuss the foreclosure sale he was led

to believe took place on December 4, 2012.  Jim asked the Green Tree representative why

Green Tree did not uphold its promise to notify him within thirty (30) days of receipt of

the application for the Modification whether the same was approved or otherwise

postpone the foreclosure sale since Green Tree did not notify him before December 4,

2012 whether the same was approved.  The female Green Tree representative Jim spoke

to told Jim that Green Tree did not have any obligation to notify Jim whether his

application for the Modification had been approved or otherwise postpone the December

4, 2012 foreclosure sale and accused Jim of "trying to get something for free."  When Jim

asked the Green Tree representative what she meant by accusing him of trying to get

something for free, the Green Tree representative callously responded "I don't stutter." At that time, Green Tree knew that it failed to uphold its contractual obligation to Jim.

57. On December 14, 2012, Jim called EPRA to discuss the foreclosure sale and again was led to believe the foreclosure sale took place on December 4, 2012.

58. On December 27, 2012, Green Tree, on behalf of Fannie Mae, acting by and through EPRA, filed a "Proceeding Against Tenant Holding Over" against Jim and Robyn in the Magistrate Court of Cobb County, Civil Action File No. 12-E-21847 (the "Dispossessory Action").[12]  In the Dispossessory Action, Green Tree caused Fannie Mae to swear (1) Fannie Mae was the owner of the Property, (2) Jim was a "tenant at sufferance; [and (3) a] foreclosure sale [was] held."[13]  At that time, Green Tree and Fannie Mae knew the sworn statements contained in the Dispossessory Action were false.

59. On December 29, 2012, Green Tree, acting on behalf of Fannie Mae, caused the Dispossessory Action to be served on Jim and Robyn by posting a copy of the same and a summons to the front door of the Property.[14]

60. On December 29, 2012, Jim called Wes Craven, the Atlanta Communities real estate agent, to contest the validity of the foreclosure sale after he received the Dispossessory Action.  Wes Craven advised Jim that he was not allowed to knock on his door unless the foreclosure sale had been completed.

61. On January 6, 2013, Wes Craven came back to the Property to offer Jim another relocation assistance agreement.  Justifiably believing the Property had been sold on December 4, 2012, and that he was otherwise unable to cure the default, Jim and Robyn

---

[12] A true and correct copy of the Proceeding Against Tenant Holding Over filed by Fannie Mae is attached hereto as Exhibit 7.
[13] *Id*.
[14] A true and correct copy of the Sheriff's Entry of Service is attached hereto as Exhibit 8.

accepted the Relocation Assistance Agreement from Fannie Mae and received the sum of $1,050.00 in exchange for executing the Relocation Assistance Agreement and a Release of All Claims.[15]

62. According to the Relocation Assistance Agreement and a Release of All Claims, Jim and Robyn agreed to voluntarily vacate the Property no later than January 6, 2013.[16]

63. On January 6, 2013, Jim and Robyn vacated the Property and, at great expense, moved their family to Ellijay, Georgia.

64. On January 10, 2013, Green Tree, acting on behalf of Fannie Mae, dismissed the Dispossessory Action against Jim and Robyn without prejudice.[17]

65. On January 29, 2013, EPRA, on behalf of Green Tree, sent a letter to Jim and Robyn advising them the "Note has been and is declared to be in default for non-payment and [Green Tree] hereby demands full and immediate payment of all amounts due and owing thereunder."[18]  Mr. Adams' letter further stated "[u]nless this loan is satisfied in accordance with this demand, the foreclosure sale of [the Property] will be conducted on . . . March 5, 2013."[19]

66. Jim and Robyn were confused when they received the January 29, 2013 letter from EPRA because they reasonably believed that the Property had already been sold on December 4, 2012 and that Fannie Mae was the current owner of the same.

---

[15] A true and correct copy of the Relocation Assistance Agreement and a Release of All Claims is attached hereto as Exhibit 9.
[16] *Id.*
[17] A true and correct copy of the Dismissal Without Prejudice is attached hereto as Exhibit 10.
[18] A true and correct copy of the January 29, 2013 letter is attached hereto as Exhibit 11.
[19] *Id.*

67. On March 5, 2013, Green Tree purchased the Property for the sum of Two Hundred Forty-Seven Thousand Three Hundred Sixty-Nine and 45/100 ($247,369.45) at the foreclosure sale.[20]

68. On May 23, 2013, Green Tree, by and through EPRA, filed a Foreclosure Deed Under Power of Sale in the Superior Court of Cobb County, Georgia.[21]

69. On May 23, 2013, Green Tree, by and through EPRA, filed a Special Warranty Deed whereby Green Tree transferred its rights to the Property to Fannie Mae.[22]

Jim and Robyn Rescinded the Relocation Assistance Agreement and Release of All Claims

70. On September 11, 2013, Plaintiffs' counsel, Charlie Gower, sent a letter to Mona Friedman, as agent for Fannie Mae and Green Tree, rescinding the Relocation Assistance Agreement and Release of All Claims Jim and Robyn executed on January 6, 2013 and enclosed a Cashiers' Check made payable to Fannie Mae in the amount of $1,050.00.[23]

71. On September 12, 2013, the undersigned received an email from Sue McKay, Chief Financial Officer for Atlanta Communities Real Estate Brokerage, acknowledging receipt of the September 11, 2013 letter and cashier's check made payable to Fannie Mae.[24]

72. On September 17, 2013, Ms. McKay sent another email to the undersigned advising that the September 11, 2013 letter and cashier's check made payable to Fannie Mae were being forwarded to Susan A. Harding, a litigation paralegal for Fannie Mae.[25]

---

[20] *See* May 23, 2013 Foreclosure Deed Under Power of Sale, a true and correct copy of the same is attached hereto as Exhibit 12.

[21] *Id*.

[22] A true and correct copy of the May 23, 2013 Special Warranty Deed is attached hereto as Exhibit 13.

[23] A true and correct copy of the September 11, 2013 letter is attached hereto as Exhibit 14.

[24] A true and correct copy of the September 12, 2013 email is attached hereto as Exhibit 15.

[25] A true and correct copy of the September 17, 2013 email is attached hereto as Exhibit 16.

Jim and Robyn Suffer Damages as a Result of Green Tree's Conduct

73. Green Tree did not intend to honor its agreement with Jim to let him know whether the application for the Modification was approved on or before December 4, 2012 or December 8, 2012 or otherwise postpone the December 4, 2012 foreclosure sale if it had not notified Jim whether it had approved the application for the Modification by December 4, 2012.  Green Tree made the above representations to Jim in order to induce Jim and Robyn to wait until after December 4, 2012 to make any attempt to cure the default so that Green Tree could foreclose on the Property.

74. Jim and Robyn justifiably relied on the representations made by Green Tree to their detriment.  Green Tree succeeded in its attempt to prevent Jim and Robyn from curing the default before December 4, 2012.

75. As a direct and proximate result of Green Tree's actions, Jim and Robyn have suffered physically, emotionally, and financially.

Green Tree's Pattern and Practice of Fraudulent and Unscrupulous
Conduct Extends Beyond its Dealings with Jim and Robyn

76. Green Tree's fraudulent and unscrupulous conduct to acquire or maintain or attempt to acquire or maintain an interest or control of real property and personal property, including money, is not limited to its dealings with Jim and Robyn.

77. For example, in 2009, Maxwell Jones ("Mr. Jones") and Cynthia Jones ("Mrs. Jones"), former Green Tree customers and residents of Columbus, Muscogee County, Georgia, ran into financial difficulties when both of them received a reduction in hours at their respective jobs and thereafter fell behind on their mortgage payments.  Green Tree scheduled a foreclosure sale of their home located at 6068 Hunter Ridge Circle, Columbus, Georgia 31907 for September 7, 2010.

78. Before the sale, Mr. Jones enlisted the help of a local non-profit group, NeighborWorks of Columbus ("NeighborWorks").  At that time, both Mr. Jones and Ms. Cecile Terry, the Jones's agent at NeighborWorks, communicated, via telephone, with Green Tree to negotiate a way to stop the foreclosure.  Green Tree's "Special Point of Contact" for the Joneses was a representative named Thomas Clark.

79. On August 13, 2010, and August 26, 2010, Mr. Clark told Mr. Jones over the telephone that if he made two monthly payments by September 3, 2010, the foreclosure sale would be cancelled and the Joneses and Green Tree would work toward getting an in-house modification agreement in place.  Maxwell agreed to make the two payments by September 3, 2010.  Mr. Clark, however, had no intention of honoring this agreement when he presented the same to Mr. Jones on August 13, 2010 and August 26, 2010.

80. On August 24, 2010 and September 1, 2010, Mr. Clark told Ms. Terry over the telephone that if the Joneses made two monthly payments by September 3, 2010, the foreclosure sale would be cancelled and the Joneses and Green Tree would work toward getting an in-house modification agreement in place.  Mr. Clark, however, had no intention of honoring this agreement when he presented the same to Ms. Terry on August 24, 2010.

81. In reliance on Green Tree's representations to Mr. Jones and Ms. Terry, the Joneses made the two payments to Green Tree on September 1, 2010.

82. Having followed Green Tree's instructions, and thinking that the sale was cancelled, the Joneses subsequently made a regular monthly payment of over $1,100 to Green Tree on September 10, 2010.  Although the Joneses upheld their end of the bargain with Green Tree, Green Tree, unbeknownst to the Joneses, sold their home at the foreclosure sale on September 7, 2010.  The Joneses did not attend the foreclosure sale of their home on

September 7, 2010 because they believed that the sale had been cancelled in accordance with Green Tree's promise.[26]

83. The Joneses struggle with Green Tree did not end with the wrongful foreclosure of their home on September 7, 2010. After the foreclosure sale Green Tree returned the Jones's three payments and filed an Affidavit for Summons of Dispossessory and a Petition for Writ of Possession to kick the Joneses out of their home.[27]

84. Green Tree filed the Petition for Writ of Possession in the Magistrate Court of Muscogee County, Georgia, knowing that it breached its contract with the Joneses, in order to create the misleading impression to the Joneses and to the Court that Green Tree was legally entitled to file the same. Green Tree knew that the Petition for Writ of Possession contained false, fictitious, or fraudulent statements and representations and that it was not otherwise entitled to file the Petition for Writ of Possession.

85. At the foreclosure sale, Green Tree purchased the Jones's home for $78,200.00. Green Tree did not confirm the sale, despite knowing that confirmation was required if Green Tree intended to legally pursue collection of any alleged deficiency balance.

86. Over a year later, Green Tree began an insidious campaign of harassment against the Joneses, using fraudulent and high-pressure tactics in an attempt to recover an alleged deficiency balance of approximately $50,000.00.[28]

87. As part of its campaign, Green Tree, as a debt collector, sent letters and made over one hundred phone calls to the Joneses. Green Tree knowingly misrepresented that the

---

[26] The Jones's struggle is well documented in the Arbitrator's Report dated April 29, 2014 in the matter of *Maxwell Jones and Cynthia Jones v. Green Tree Servicing, LLC,* an arbitration proceeding in the State Court of Muscogee County, Georgia, Civil Action File No. SC12CV1243. A true and correct copy of the same is attached hereto as Exhibit 17.
[27] *Id.*; *see also* Affidavit for Summons of Dispossessory and Petition for Writ of Possession, collectively attached hereto as Exhibit 18.
[28] *See* Exhibit 17.

alleged $50,000.00 deficiency was a legally collectible debt and improperly threatened to

take legal action that it could not, in fact, take because the foreclosure sale was not

confirmed.

88. On April 24, 2012, Green Tree sent a letter to Mrs. Jones in which Green Tree knowingly

misrepresented that the alleged $50,000.00 deficiency balance was a legally collectible

debt and improperly threatened to take legal action that it could not, in fact, and knew it

could not take because the foreclosure sale was not confirmed.[29]

89. On July 23, 2012, Green Tree sent a letter to Mrs. Jones in which Green Tree knowingly

misrepresented that the alleged $50,000.00 deficiency balance was a legally collectible

debt and that she is "responsible for the balance and it is due in full" even though the

foreclosure sale was not confirmed.[30]  Green Tree knew that it was not allowed by law to

collect the alleged deficiency balance because the foreclosure sale was not confirmed

when it sent the July 23, 2012 letter to Mrs. Jones.

90. On July 31, 2012, Green Tree sent another letter to Mrs. Jones attempting to collect the

alleged $50,000.00 deficiency balance.[31]  In this letter, Green Tree offered the Joneses a

"Balance Reduction Program" "to help [them] reduce [their] outstanding balance and the

length of time to pay if off."  Green Tree knew that it was not allowed by law to collect

the alleged deficiency balance because the foreclosure sale was not confirmed when it

sent the July 31, 2012 letter to Mrs. Jones.

91. Green Tree only stopped harassing the Joneses after they filed a lawsuit against Green

Tree, asserting claims for wrongful foreclosure, intentional infliction of emotional

---

[29] A true and correct copy of the April 24, 2012 letter is attached hereto as Exhibit 19.
[30] A true and correct copy of the July 23, 2012 letter is attached hereto as Exhibit 20.
[31] A true and correct copy of the July 31, 2012 letter is attached hereto as Exhibit 21.

distress, fraud, violations of the Fair Debt Collection Practices Act, and violations of the

Georgia Racketeer Influenced Corrupt Organizations Act.[32]

92. The contract in issue contained an arbitration clause that states all disputes arising out of

or relating to the underlying mortgage contract must be resolved by binding arbitration

governed by the Federal Arbitration Act.  On June 13, 2013, Muscogee County State

Court Judge Andrew Prather appointed Judge William J. Smith to serve as the arbitrator

in the Joneses dispute with Green Tree.  The arbitration trial was held on February 3,

2014 through February 6, 2014.  On April 29, 2014, Judge Smith issued his Arbitrator's

Report.[33]

93. Within the Arbitrator's Report, Judge William J. Smith of Columbus, Georgia concluded,

*inter alia*, the following:

   a.  At the time it sold the Jones's home, Green Tree did not have a legal right to

   foreclosure because it had previously entered into an agreement to cancel the

   foreclosure sale, upon which agreement the Joneses reasonably relied to their

   detriment and was therefore liable for the tort of wrongful foreclosure.[34]

   b.  Green Tree intentionally foreclosed upon the Jones's home despite its agreement

   to cancel the foreclosure if the Joneses paid $2,204.98 by September 3, 2010.

   Green Tree's failure to uphold its end of the bargain resulted in the devastating

   loss of the Jones's family home, as well as to their martial separation.  The

   Joneses injures were exacerbated when Green Tree intentionally began attempting

   to collect a deficiency balance from the Joneses that Green Tree knew the Joneses

---

[32] A true and correct copy of the Complaint the Joneses filed against Green Tree is attached
hereto as Exhibit 22.
[33] *See generally* Exhibit 17.
[34] *Id.*

were not legally obligated to pay.  As a result of the above, the Joneses suffered

from severe emotional problems, including PTSD and major depression and,

therefore, Green Tree is liable for the damages arising from its intentional

infliction of emotional distress.[35]

c.   Green Tree is liable to the Joneses for fraud arising from the promises it made to

the Joneses without any present intention to perform by cancelling the foreclosure

sale.  Furthermore, the Joneses did justifiably rely on Green Tree's promise to

their detriment and consequently suffered damages for which Green Tree is

liable.[36]

d.   Green Tree repeatedly and intentionally violated several provisions of the Fair

Debt Collection Practices Act and, therefore, Green Tree is liable for the Jones's

actual damages resulting from Green Tree's numerous and repeated violations of

the Fair Debt Collection Practices Act.[37]

e.   Green Tree engaged in a pattern of racketeering activity consisting of more than

two predicate acts, for example, mail and wire fraud, necessary to sustain

Plaintiffs' Georgia RICO claim, Green Tree's violations of the Georgia RICO

statute proximately caused damages to the Joneses, and, therefore, the Joneses are

entitled to an award of treble damages and punitive damages.[38]

f.   Green Tree's conduct towards Maxwell and Cynthia Jones showed willful

misconduct, malice, fraud, wantonness, oppression, or that entire want of care

which would raise the presumption of indifference to the consequences with a

---

[35] *Id*.

[36] *Id*.

[37] *Id*.

[38] *Id*.

specific intent to cause harm, therefore entitling Maxwell and Cynthia to an award

of punitive damages in excess of the $250,000.00 statutory cap.[39]

94. Judge Smith also concluded the evidence presented by two other former Green Tree

customers, Karena Nichols and and Jim Quasebarth, during the arbitration trial further

established Green Tree's pattern of conduct giving rise to liability under the Georgia

RICO statute.[40]

95. Karena Nichols, a former Green Tree customer, found herself to be a target of Green

Tree's common practice of using harassing and deceptive tactics to demand payment of

alleged deficiency balances that is was not not legally entitled to collect.[41]  After Green

Tree foreclosed on Ms. Nichols' home and failed to confirm the foreclosure sale, she

began receiving hundreds of harassing and threatening phone calls and numerous letters

from Green Tree demanding payment of an alleged deficiency balance.[42]  At the same

time, Green Tree also sent letters to Ms. Nichols offering her a "debt reduction program"

if she agreed to make certain payments to Green Tree toward the deficiency balance, and

after a year of payments Green Tree would give her a "credit" to reduce the overall

balance.

96. On November 20, 2008, Green Tree sent Ms. Nichols a letter in which Green Tree

knowingly misrepresented the alleged $14,711.82 deficiency balance was a legally

collectible debt and offered to resolve the same for $7,355.91.[43]  Green Tree, however,

knew that it was not allowed by law to collect the alleged deficiency balance because the

---

[39] *Id*.

[40] *Id*.

[41] *Id*; *see also* 12 OKL. ST. § 686 (2013), a true and correct copy of the same is attached hereto as Exhibit 23.

[42] Exhibit 17.

[43] A true and correct copy of the November 20, 2008 letter is attached hereto as Exhibit 24.

foreclosure sale was not confirmed when it sent the November 20, 2008 letter to Ms.

Nichols.

97. On December 3, 2008, Green Tree sent another letter to Ms. Nichols in which Green Tree

knowingly misrepresented that Ms. Nichols was "responsible for [the alleged deficiency

balance] and it is due in full."[44]  Green Tree, however, knew that it was not allowed by

law to collect the alleged deficiency balance because the foreclosure sale was not

confirmed when it sent the December 3, 2008 letter to Ms. Nichols.

98. On January 3, 2009, Green Tree sent another letter to Ms. Nichols in which Green Tree

knowingly misrepresented that the alleged deficiency balance was a legally collectible

debt and improperly threatened to take legal action that it could not, in fact, and knew it

could not take because the foreclosure sale had not been confirmed.[45]  Green Tree,

however, knew that it was not allowed by law to collect the alleged deficiency balance

because the foreclosure sale was not confirmed when it sent the January 2, 2009 letter to

Ms. Nichols.

99. On February 5, 2009, Green Tree sent another letter to Ms. Nichols in which Green Tree

knowingly misrepresented that the alleged deficiency balance was a legally collectible

debt and improperly threatened to take legal action that it could not, in fact, and knew it

could not take because the foreclosures sale had not been confirmed.[46]  Green Tree,

however, knew that it was not allowed by law to collect the alleged deficiency balance

because the foreclosure sale was not confirmed when it sent the February 5, 2009 letter to

Ms. Nichols.

---

[44] A true and correct copy of the December 3, 2008 letter is attached hereto as Exhibit 25.
[45] A true and correct copy of the January 2, 2009 letter is attached hereto as Exhibit 26.
[46] A true and correct copy of the February 5, 2009 letter is attached hereto as Exhibit 27.

100. On October 2, 2009, Green Tree sent another letter to Ms. Nichols in which Green Tree knowingly misrepresented that the alleged deficiency balance was a legally collectible debt and improperly threatened to take legal action that it could not, in fact, and knew it could not take because the foreclosure sale had not been confirmed.[47]  Green Tree, however, knew that it was not allowed by law to collect the alleged deficiency balance because the foreclosure sale was not confirmed when it sent the October 2, 2009 letter to Ms. Nichols.

101. On October 8, 2009, Green Tree sent another letter to Ms. Nichols in which Green Tree knowingly misrepresented that the alleged deficiency balance was a legally collectible debt and improperly threatened to take legal action that it could not, in fact, and knew it could not take because the foreclosure sale had not been confirmed.[48]  Green Tree, however, knew that it was not allowed by law to collect the alleged deficiency balance because the foreclosure sale was not confirmed when it sent the October 8, 2009 letter to Ms. Nichols.

102. Reluctantly, Ms. Nichols acquiesced and began paying Green Tree $100.00 per month toward the purported deficiency to avoid, according to Green Tree, negative legal consequences.[49]  When Ms. Nichols fell behind on these deficiency payments, Green Tree sued Ms. Nichols in Oklahoma state court.[50]  Ms. Nichols has asserted several counterclaims against Green Tree including, but not limited to, that Green Tree engages in a pattern and practice of collecting otherwise legally unenforceable debts or

---

[47] A true and correct copy of the October 2, 2009 letter is attached hereto as Exhibit 28.
[48] A true and correct copy of the October 8, 2009 letter is attached hereto as Exhibit 29.
[49] Exhibit 17.
[50] A true and correct copy of Green Tree's Petition is attached hereto as Exhibit 30.

deficiencies through fraudulent, harassing, extortionate, and deceptive means.[51]  Ms. Nichols has asserted her counterclaims against Green Tree on behalf of a class of similarly situated individuals that included hundreds of former Green Tree customers in Oklahoma.[52]

103.  Mr. Rick Daugherty, a Regional Manager for Green Tree, admitted that sending the above letters to Ms. Nichols was misleading because Ms. Nichols was not, in fact, legally obligated to pay Green Tree anything.[53]

## COUNT 1

## VIOLATIONS OF GEORGIA'S RACKATEERING INFLUCENCED CORRUPT ORGANIZATIONS ACT ("RICO")

104.  Plaintiffs incorporate paragraphs 1 through 103 herein.

105.  Green Tree's conduct as set forth above violates the Georgia RICO statute, O.C.G.A. § 16-14-1 *et seq*.

106.  Jim and Robyn are "persons" within the meaning of the Georgia RICO statute.

107.  Green Tree is a "person" within the meaning of the Georgia RICO statute.

108.  Green Tree, through a pattern of racketeering activity or proceeds derived therefrom, acquired or maintained an interest in or control of an enterprise, real property, or personal property of any nature, including money, in violation of O.C.G.A. § 16-4-4(a).

---

[51] A true and correct copy of Ms. Nichols' Second Amended Answer and Counterclaim is attached hereto as Exhibit 31; *see also* Ms. Nichols' Sur Reply to Green Tree's Reply Brief attached hereto as Exhibit 32.
[52] *Id*.
[53] Exhibit 17.

109.   Green Tree endeavored, though a pattern of racketeering activity or proceeds derived therefrom, to acquire and maintain, directly and indirectly, an interest in real property or personal property, including money, in violation of O.C.G.A. § 16-4-4(c).

110.   In furtherance of violating O.C.G.A. § 16-4-4(a) and (c), Green Tree committed, attempted to commit, or solicited, coerced, or intimated another person to commit the following crimes that constitute a pattern of racketeering activity under Georgia RICO:

   a.   Knowingly and willfully falsifying, concealing, or covering up by any trick, scheme, or device a material fact; making false, fictitious, or fraudulent statements or representations; or making or using any false writing or document, knowing the same to contain false, fictitious, or fraudulent statements in violation of O.C.G.A. § 16-10-20 (false statements).

   b.   Knowingly and willfully making false statements material to the issue or point in question, in a judicial proceeding, in violation of O.C.G.A. § 16-10-70 (perjury).

   c.   Knowingly and willfully making a false statement, in any matter or thing other than a judicial proceeding, by executing a document after having been administered a lawful oath or affirmation and knowing that the document purports to be an acknowledgement of a lawful oath or affirmation in violation of O.C.G.A. § 16-10-71 (false statements).

   d.   Unlawfully obtaining money and property by any deceitful means or artful practice with the intent of depriving the owner of the money or property in violation of O.C.G.A. § 16-8-3 (theft by deception).

   e.   Unlawfully sending, causing to be sent, and receiving letters, or other papers and items, through the U.S. Postal Service, for the purpose of executing and

attempting to execute the Defendants' fraudulent scheme in violation of 18 U.S.C. § 1341 (mail fraud).

f.   Unlawfully causing to be sent and receiving writings and sound communications for the purpose of executing and attempting to execute its fraudulent scheme in violation of 18 U.S.C. § 1343 (wire fraud).

g.    Unlawfully obtaining property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right in violation of 18 U.S.C. § 1951(a) (extortion).

111.  Green Tree violated O.C.G.A. § 16-10-20 on December 27, 2012, when it filed or caused to be filed the Dispossessory Action (Ex. 7) on behalf of Fannie Mae when it knowingly and willfully falsified, concealed, or covered up by trick, scheme, or device a material fact.  The material facts that Green Tree knowingly and willfully falsified, concealed or covered up by trick, scheme, or device are (a) Green Tree breached its contract with Jim when it failed to postpone the December 4, 2012 foreclosure sale because it did not notify Jim whether the application for the Modification was approved on or before December 4, 2012; (b) that Green Tree did not have a legal right to foreclose on the Property; and (c) that the December 4, 2012 foreclosure sale was not finalized and that title to the property was still in the name of Jim and Robyn.

112.  Green Tree also violated O.C.G.A. § 16-10-20 on December 27, 2012, when it made or used any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry.  The false, fictitious, or fraudulent statements or entries contained in the Dispossessory Action are (a) Fannie Mae was the owner of the

Property, (b) Jim was a tenant at sufferance, and (c) Fannie Mae "is entitled to recover any and all rent that may come due until this action is finally concluded."

113.  Green Tree violated O.C.G.A. § 16-10-20 on October 5, 2010, when it filed the Petition for Writ of Possession in the Magistrate Court of Muscogee County, Georgia (Ex. 18) knowing that it did not have a legal right to file the same since it breached its contract with the Joneses.

114.  Green Tree violated O.C.G.A. § 16-10-20 on October 5, 2010, when it filed the Affidavit for Summons of Dispossessory in the Muscogee County Magistrate Court (Ex. 18).

115.  Green Tree violated O.C.G.A. § 16-10-70 on October 5, 2010, when it filed the Affidavit for Summons of Dispossessory in the Muscogee County Magistrate Court (Ex. 18).

116.  Green Tree violated O.C.G.A. § 16-10-71 on October 5, 2010, when it executed the Affidavit for Summons of Dispossessory (Ex. 18).

117.  Green Tree committed the crime of theft by deception (O.C.G.A. § 16-8-3) on two or more occasions (Ex. 24 through 29) by falsely representing to Karina Nichols that she owed Green Tree the alleged deficiency balance.  Green Tree knew these representations to be false, yet unlawfully obtained money from Ms. Nichols, with the intent of depriving her of the same, when Ms. Nichols began sending Green Tree payments towards the alleged deficiency balance.

118.  Green Tree violated 18 U.S.C. § 1341 (mail fraud) on the following occasions for the purpose of executing and attempting to execute the Defendants' fraudulent scheme to acquire and maintain an interest in real property or personal property, including money:

a.  On October 16, 2012, when it sent or caused to be sent a letter to Jim and Robyn through the U.S. Postal Service.[54]

b.  On April 24, 2012, when Green Tree sent a letter to Cynthia Jones through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 19).

c.  On July 23, 2012, when Green Tree sent a letter to Cynthia Jones through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 20).

d.  On July 31, 2012, when Green Tree sent a letter to Cynthia Jones through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 21).

e.  On November 20, 2008, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 24).

f.  On December 3, 2008, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 25).

g.  On January 2, 2009, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 26).

---

[54] *See* Exhibit 11 wherein the October 16, 2012 letter is referenced.  Plaintiffs do not currently possess a copy of the October 16, 2012 letter.

h. On February 5, 2009, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 27).

i. On October 2, 2009, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 28).

j. On October 8, 2009, when Green Tree sent a letter to Karina Nichols through the U.S. Postal Service seeking to collect the alleged deficiency balance Green Tree knew it was not legally entitled to recover (Ex. 29).

119. Green Tree violated 18 U.S.C. § 1343 on the following occasions for the purpose of executing and attempting to execute the Defendants' fraudulent scheme to acquire and maintain an interest in real property or personal property, including money:

a. On October 24, 2012, when Andre Stetson told Jim over the telephone that Green Tree would advise him whether the application for the Modification was approved before December 4, 2012.

b. On October 29, 2012, when a Green Tree representative told Jim over the telephone that Green Tree would advise him whether the application for the Modification was approved before December 4, 2012.

c. On November 6, 2012, when Andre Stetson told Jim over the telephone that Green Tree would advise him whether the application for the Modification was approved within 30 days from the date Jim submitted the second application for the Modification to Green Tree and that if Green Tree had not notified him of the

same by December 4, 2012, Green Tree would postpone the December 4, 2012

foreclosure sale.

d.   On December 10, 2012, when a Green Tree representative told Jim over the

telephone that the December 4, 2012 foreclosure sale was final and that Jim and

Robyn no longer owned the Property.

e.   On August 13, 2010, when Mr. Clark told Maxwell Jones over the telephone that

if he made two monthly payments by September 3, 2010, the foreclosure sale

would be cancelled and the Joneses and Green Tree would work toward getting an

in-house modification agreement in place.

f.   On August 24, 2010, when Mr. Clark told Ms. Terry over the telephone that if the

Joneses made two monthly payments by September 3, 2010, the foreclosure sale

would be cancelled and the Joneses and Green Tree would work toward getting an

in-house modification agreement in place.

g.   On August 26, 2010, when Mr. Clark told Maxwell Jones over the telephone that

if he made two monthly payments by September 3, 2010, the foreclosure sale

would be cancelled and the Joneses and Green Tree would work toward getting an

in-house modification agreement in place.

h.   On September 1, 2010, when Mr. Clark told Ms. Terry over the telephone that if

the Joneses made two monthly payments by September 3, 2010, the foreclosure

sale would be cancelled and the Joneses and Green Tree would work toward

getting an in-house modification agreement in place.

120.  Green Tree violated 18 U.S.C. § 1951(a) for the purpose of executing and attempting to

execute the Defendants' fraudulent scheme to acquire and maintain an interest in real

property or personal property, including money, when Karena Nichols began sending

Green Tree payments towards the alleged deficiency balance Green Tree induced her to

pay by wrongful and actual use of fear of economic loss.

121.   Green Tree has engaged in a pattern of racketeering activity, as set forth above, by

committing, attempting to commit, or soliciting or coercing another to commit the

above-predicate acts.

122.   Green Tree, through its pattern of racketeering activity, directly and indirectly acquired

or maintained an interest in or control of real or personal property of any nature,

including money, of Plaintiffs and others.

123.   Green Tree, through its pattern of racketeering activity, directly and indirectly

attempted to acquire or maintain an interest in or control of real and personal property

of any nature, including money, of Plaintiffs and others.

124.   Green Tree's wrongful and intentional acts alleged herein constitute separate incidents

of racketeering activity within the meaning of Georgia RICO.  The multiple acts of

racketeering activity are interrelated, part of a common and continuous pattern of

fraudulent acts and schemes, were perpetrated for the same or similar purposes, and

were not a series of disconnected, isolated, or sporadic acts.  The predicate acts set forth

above are part of the regular and routine way in which Green Tree transacts business.

125.   Green Tree's wrongful and intentional acts alleged herein proximately caused damage

to Plaintiffs.  Plaintiffs' injuries flow directly from the predicate offenses set forth

herein.

126.   Plaintiffs seek to recover all damages allowable as a result of such violations, including, but not limited to, emotional damages, attorneys' fees, treble damages, and punitive damages.

## COUNT 2

## BREACH OF CONTRACT

127.   Plaintiffs incorporate paragraphs 1 through 126 herein.

128.   Green Tree breached its October 24, 2012 contract with Plaintiffs when it failed to notify Jim on or before December 4, 2012 whether Green Tree approved the application for the Modification.

129.   Green Tree breached its November 6, 2012 contract with Plaintiffs when it failed to notify Jim within thirty (30) days of Green Tree's receipt of the application of the Modification whether Green Tree approved the same (on or before December 8, 2012).

130.   Green Tree breached its November 6, 2012 contract with Plaintiffs when it failed to postpone the December 4, 2012 foreclosure sale since Green Tree did not notify Plaintiffs whether the application for the Modification had been approved by December 4, 2012.

131.   Plaintiffs have suffered substantial injuries as a direct and proximate result of Green Tree's breach of contract.

## COUNT 3

## INTERFERENCE WITH PROPERTY RIGHTS

132.   Plaintiffs incorporate paragraphs 1 through 131 herein.

133.  Green Tree had a duty under Georgia law not to unlawfully interfere with Plaintiffs' enjoyment of their property or to interfere with their rights to their property.  *See* O.C.G.A. § 51-9-1.

134.  Green Tree breached their duty to Plaintiffs when it failed to notify Jim before December 4, 2012 or, at the latest, before December 8, 2012, whether the application for the Modification was approved and to postpone the December 4, 2012 foreclosure sale.

135.  Green Tree also breached their duty to Plaintiffs when it failed to postpone the December 4, 2012 foreclosure sale since Green Tree did not notify Jim whether the application for the Modification had been approved by December 4, 2012.

136.  When Green Tree attempted to sell the Property on December 4, 2012, Green Tree intentionally and unlawfully prevented Jim from curing the default on his mortgage since Green Tree knew that Jim reasonably believed that the foreclosure had been postponed based on Green Tree's agreement to postpone the foreclosure sale in the event that it did not notify Jim before December 4, 2012 whether the application for the Modification had been approved.  In so doing, Green Tree unlawfully interfered with Plaintiffs' enjoyment of their property or otherwise interfered with their rights to their property.

137.  As a direct and proximate result of Green Tree's attempt to sell the Property on December 4, 2012, Green Tree caused Fannie Mae to file the Dispossessory Action on December 27, 2012 seeking to deprive Plaintiffs' of their rightful possession of the premises and subsequently induced Plaintiffs to sign the Relocation Assistance Agreement and vacate the Property on or before January 6, 2013.

138.  Plaintiffs have suffered damages as a direct and proximate result of Green Tree's unlawful interference with Plaintiff's property rights, including, but not limited to, physical and emotional distress and financial loss related to relocating their family to Ellijay, Georgia in January, 2013.

**COUNT 4**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

139.  Plaintiffs incorporate paragraphs 1 through 138 herein.

140.  Green Tree acted intentionally and recklessly when it falsely represented to Jim that it was considering whether to approve the application for the Modification when in fact Green Tree never intended to approve the same.

141.  Green Tree acted intentionally and recklessly when it falsely represented to Jim that it would notify him on or before December 4, 2012 whether it was going to approve the application for the Modification when in fact Green Tree never intended to approve the same or notify Jim of the same on or before December 4, 2012.

142.  Green Tree acted intentionally and recklessly when it falsely represented to Jim that it would notify him within 30 days of receipt of the second application for the Modification whether it was going to approve the same when in fact Green Tree never intended to approve the application for the Modification or notify Jim whether it was going to approve the same within thirty (30) days of receipt thereof (on or before December 8, 2012).

143.  Green Tree acted intentionally and recklessly when it falsely represented to Jim that it would postpone the December 4, 2012 foreclosure sale in the event Green Tree did not

notify him whether the application for the Modification had been approved on or before December 4, 2012.

144. Green Tree acted intentionally and recklessly when it unlawfully attempted to sell the Property on December 4, 2012.

145. By unlawfully attempting to sell the Property on December 4, 2012, Green Tree knew that Fannie Mae would seek to evict Plaintiffs from the Property.

146. Green Tree's actions constitute extreme and outrageous conduct.

147. Plaintiffs have suffered emotional and physical distress as a direct and proximate result of Green Tree's extreme and outrageous misconduct.

148. Green Tree is liable to Plaintiffs for the tort of intentional infliction of emotional distress.

**COUNT 5**

**FRAUD**

149. Plaintiffs incorporate paragraphs 1 through 148 herein.

150. On October 24, 2012, Andre Stetson, acting on behalf of Green Tree falsely represented to Jim, over the telephone, that Green Tree would notify him whether the application for the Modification was approved on or before December 4, 2012. Mr. Stetson made this false representation to Jim with the intent to deceive Jim and cause Jim to refrain from curing the default on or before December 4, 2012 in reliance on this false representation.

151. On October 29, 2012, a Green Tree representative falsely represented to Jim, over the telephone, that Green Tree could notify him whether the application for the Modification was approved on or before December 4, 2012. The Green Tree

representative made this false representation to Jim with the intent to deceive Jim and cause Jim to refrain from curing the default on or before December 4, 2012 in reliance on this false representation.

152. On November 6, 2012, Andre Stetson acting on behalf of Green Tree falsely represented to Jim, over the telephone, that Green Tree would notify him whether the application for the Modification was approved within thirty (30) days from the date it received the application for the Modification and, if Green Tree did not notify Jim of the same before December 4, 2012, Green Tree would postpone the December 4, 2012 foreclosure sale. Mr. Stetson made this false representation to Jim with the intent to deceive Jim and cause Jim to refrain from curing the default on or before December 4, 2012 in reliance on this false representation.

153. Jim justifiably relied on the false representations Green Tree made to him on October 24, 2012, October 29, 2012, and November 6, 2012 and did not cure the default on or before December 4, 2012 believing that the foreclosure sale had been postponed.

154. As a direct and proximate result of the false misrepresentations Green Tree made to Jim over the telephone on October 24, 2012, October 29, 2012, and November 6, 2012, Green Tree unlawfully acquired an interest in or control over the Property.

155. As a direct and proximate result of Jim's justifiable reliance on the false representations Green Tree made to him on October 24, 2012, October 29, 2012, and November 6, 2012, Plaintiffs suffered damages.

## COUNT 6

## NEGLIGENCE PER SE

156. Plaintiffs incorporate paragraphs 1 through 155 herein.

157. According to O.C.G.A. § 51-9-1, Green Tree had a duty not to interfere with Plaintiffs' property rights.

158. According to 18 U.S.C. § 1341, Green Tree had a duty not to send, cause to be sent, and cause to be delivered any letters, and other papers and items through the U.S. Postal Service for the purpose of depriving Plaintiffs of their rights to the Property.

159. According to 18 U.S.C. § 1343, Green Tree had a duty not to transmit or cause to be transmitted by means of wire any writings, signs, signals, pictures, or sounds for the purpose to depriving Plaintiffs of the rights to the Property.

160. Green Tree had a duty under common law not to intentionally harm Plaintiffs.

161. Green Tree's violations of its statutory and common law duties to Plaintiffs have caused severe damage to Plaintiffs.

## COUNT 7

### ATTORNEYS' FEES AND EXPENSES OF LITIGATION

162. Plaintiffs incorporate paragraphs 1 through 161 herein.

163. Green Tree has acted in bad faith, has been stubbornly litigious, and has caused Plaintiff's unnecessary trouble and expense, entitled Plaintiff's to recover attorneys' fees and expenses of litigation under O.C.G.A. § 13-6-11.

164. Plaintiffs are also entitled to recover attorneys' fees and expenses of litigation as provided under Georgia RICO, O.C.G.A. § 16-14-6(c).

## COUNT 8

### TREBLE DAMAGES

165. Plaintiffs incorporate paragraphs 1 through 164 herein.

166.  Plaintiffs are entitled to recover treble damages in accordance with Georgia RICO, O.C.G.A. § 16-14-6(c).

## COUNT 9

## PUNITIVE DAMAGES

167.  Plaintiffs incorporate paragraphs 1 through 166 herein.

168.  Green Tree is liable under O.C.G.A. § 51-12-5.1 for its willful, malicious, and reckless conduct and for its specific intent to cause harm to Plaintiffs.

WHEREFORE, Plaintiffs pray that they recover the following:

a.  Actual damages,

b.  Emotional damages;

c.  General damages;

d.  Attorneys' fees and expenses of litigation;

e.  Treble damages;

f.  Punitive damages;

g.  Such other damages are appropriate in this case; and

h.  Trial by jury.

This 11th day of August, 2014.

Respectfully submitted:

CHARLES A. GOWER, P.C.

*/s/ Charlie Gower*
CHARLES A. GOWER
Georgia Bar No. 303500
DAVID T. ROHWEDDER
Georgia Bar No. 104056

1425 Wynnton Road
Post Office Box 5509 (mailing)

Columbus, Georgia 31906
Telephone: (706) 324-5685
Facsimile: (706) 322-2964
*Attorneys for Plaintiffs*